**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LAWERENCE OAKLEY, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) No. 16 C 11126 |
| | ) |
| TARRY WILLIAMS, BRIAN GIVENS, | ) Judge Virginia M. Kendall |
| ANNA MCBEE, SHERWIN MILES, | ) |
| YOLANDA NELSON, | ) |
| KAREN RABIDEAU, | ) |
| | ) |
| *Defendants*. | ) |

## MEMORANDUM ORDER AND OPINION

Thurmond Dawkins, an inmate at Stateville Correctional Center ("Stateville") attacked his cellmate, Lawerence Oakley, on December 4, 2014, causing Oakley to suffer, among other injuries, a traumatic brain injury. Oakley subsequently sued six employees of the Illinois Department of Corrections, alleging that they were deliberately indifferent to a substantial risk that Dawkins would seriously injure him, in violation of Oakley's Eighth Amendment rights. Defendants now move for summary judgment, arguing that Defendants Williams, Givens, McBee, Miles, and Rabideau were not aware of any substantial threats to Oakley's safety and that Defendant Nelson was not responsible for creating an increased risk that Dawkins would injure Oakley. For the reasons set forth below, the Motion for Summary Judgment (Dkt. 92) is granted as to Defendants Williams and Nelson and denied as to Defendants Givens, McBee, Miles, and Rabideau.

### BACKGROUND

In 2014, Lawerence Oakley was an inmate in the custody of the Illinois Department of Corrections ("IDOC") at Stateville Correctional Center. (Dkt. 110 ¶¶ 1, 20.) Between June 26,

1

2014 and December 4, 2014, Thurman Dawkins was Oakley's cellmate in Cell 922 in a building known as "E-House." (Dkt. 110 ¶ 21; Dkt. 118 ¶ 6.) Dawkins was serving a 48-year sentence for murder and attempted murder. (Dkt. 94-8 at p. 3.) Oakley was serving a 74-year sentence for predatory sexual assault. (Dkt. 94-1 at p. 4.) Karen Rabideau, the Placement Officer at Stateville, assigned these inmates to be cellmates. (Dkt. 118 ¶ 4.)

According to Oakley, sometime prior to December 4, 2014, Oakley wrote a letter (also known as a "kite") to Karen Rabideau in which he asked to be moved from his cell because he feared for his safety being in a cell with Dawkins. (*Id.* ¶ 26.) Oakley claims that the kite stated that he feared that Dawkins would violently assault him and that his fears would grow the longer they remained cellmates. (*Id.*) Rabideau does not recall receiving such a letter, but she admits that even if she had, she would not have kept it nor would she have kept any log of it. (Dkt. 94-6 at pp. 9–10; Dkt. 118 ¶ 28.) Dawkins also sent Rabideau a kite indicating that it would be better if he and Oakley were separated to avoid the possibility of a physical altercation and because they were not getting along well. (Dkt. 118 ¶ 27; Dkt. 110 ¶ 47.) Rabideau likewise does not recall receiving such a kite but admits that had she received such a kite, she would not have kept it nor logged it in any record. (Dkt. 94-6 at p. 9; Dkt. 118 ¶ 28.) Oakley testified that in response to his kite, Rabideau sent him a written reply indicating that he was "properly placed." (Dkt. 118 ¶ 30.) Dawkins testified that Rabideau never responded to his kite. (*Id.*) Rabideau also does not recall responding to kites from Oakley or Dawkins. (*Id.* ¶ 28.) If Rabideau had received or responded to any such kite, she would not have forwarded the kite or her response to the warden's office. (*Id.* ¶ 29.)

According to Oakley's deposition, Oakley sent a kite in October or November of 2014 to Sherwin Miles, Oakley's correctional counselor, asking to be moved away from Dawkins because he was in fear for his safety. (*Id.* ¶ 33.) Oakley testified that he received a response from Miles

indicating that Oakley was "properly placed." (*Id.*)[1] According to Miles, had she received such a kite, she would have immediately notified the inmate's correctional sergeant and lieutenant. (*Id.* ¶ 34.) Miles was in the practice of logging some, but not all, inmate communications in the Case History and Management System ("CHAMPS"). (Dkt. 94-3 at pp. 6–7, 17.) Specifically, however, Miles kept no record of grievances or kites that she received from inmates and she did not retain copies of kites or grievances. (Dkt. 118 ¶¶ 36, 38.) Inmates at Stateville did not get receipts for grievances they submitted, and there was no system in place for counselors like Miles to log grievances. (*Id.* ¶ 39.) Miles made six entries in CHAMPS regarding Oakley in 2014, none of which refer to a complaint by Oakley about his cellmate. (Dkt. 94-3 at p. 30.)

Oakley further testified that in approximately November of 2014 he sent a written grievance to Miles and Anna McBee, the Stateville grievance officer, indicating that he was in fear for his safety as a result of danger posed to him by Dawkins. (Dkt. 118 ¶ 35.) In that grievance, Oakley suggested the name of an alternate cellmate. (*Id.*) According to Oakley, McBee responded to him, indicating the she was denying the grievance because he was attempting to pick his cellmate. (*Id.*) McBee does not recall whether Oakley or Dawkins submitted grievances to her about their cellmate situation. (*Id.* ¶ 40.) McBee also explained that she never spoke to inmates about the results of the grievances they submitted. (*Id.* ¶ 40.)

Oakley also testified that sometime prior to December 4, 2014, he approached Brian Givens, a Stateville lieutenant, to tell him that he was trying to get moved from his cell because he feared for his safety. (Dkt. 118 ¶ 44.) According to Oakley, Givens responded by saying, "we'll

---

[1] Defendants' repeated objections to Oakley's use of his own testimony to support these facts are objections that go to the weight of the evidence, not to whether the Court should consider them for purposes of the instant Motion. It is appropriate for Oakley to rely on his own deposition testimony for purposes of this Motion.

see what happens." (*Id.*) As a lieutenant, Givens was empowered to move Oakley into protective custody, but he did not do so. (Dkt. 118 ¶¶ 45, 49.)

Tarry Williams, the warden of Stateville in 2014, sometimes reviewed and responded to inmate kites and grievances. (Dkt. 118 ¶ 41.) Oakley does not present any facts suggesting that Williams personally reviewed or made decisions regarding any of Oakley's kites or grievances. And Dawkins never wrote or spoke to Williams about issues he had with Oakley. (Dkt. 110 ¶ 38.)

According to Oakley's deposition, sometime prior to December 4, 2014, Yolanda Nelson, a legal mail officer, yelled at Oakley in the presence of Dawkins, calling Oakley a "fag," a "racist," and a "woman hater." (Dkt. 118 ¶ 23.)[2] Oakley further testified that Nelson walked around Oakley's floor telling all the inmates, some of whom were African-American, that the "white guy in 922" (a reference to Oakley) was a "racist," a "fag," and a "woman hater." (*Id.*) Nelson disputes having ever made such a statement about Oakley. (*Id.*)

On the afternoon of December 4, 2014, Dawkins and Oakley were locked inside Cell 922 and there were no correctional officers in the E-House due to a shift change. (*Id.* ¶ 10.) During that shift change, Dawkins attacked Oakley, causing him severe injuries to his head and face, including a large laceration on his forehead. (*Id.*) Shortly after the attack, Sergeant Walter Baker came to the cell and observed that Oakley was injured and that there was a large pool of blood on the floor. (*Id.* ¶ 11.) When Baker asked Dawkins what had happened, Dawkins responded that "Oakley is a shit talker." (*Id.* ¶ 11.) Warden Williams went to the cell following the attack and an inmate in a

---

[2] Oakley also contends that Dawkins told Oakley that he hates racists and "fags," but the only support for this comes from an affidavit that Oakley wrote and submitted with his response to the instant Motion. Oakley's counsel did not ask whether Dawkins made such a comment in Oakley's deposition nor in Dawkins's deposition. This affidavit is not proper evidence for the Court to consider in determining whether a genuine issue of material fact exists, as it is hearsay for which no hearsay exception applies. Even if it was not hearsay, it is irrelevant to determining whether Defendants were deliberately indifferent because there is no allegation that Defendants were aware that Dawkins had told Oakley that he hated racists and gay people. Because there is no evidence that Defendants had any knowledge of Dawkins's alleged homophobia or hatred of racists, whether Dawkins was actually homophobic or hated racists has no bearing on whether Defendants were deliberately indifferent to a risk of injury to Oakley.

4

neighboring cell told Williams that Dawkins attacked Oakley because Oakley called Dawkins an "n-word." (*Id.* ¶ 53.)

Leslie Turner, an IDOC Investigator, investigated the scene of the attack and determined that Dawkins had stomped on Oakley's face, as evidenced by a shoe impression visible on Oakley's face that matched Dawkins's shoes. (*Id.* ¶ 13.) IDOC subsequently charged Dawkins with—and adjudicated him guilty of—a violent assault on another. (*Id.* ¶ 18.) Prior to this offense, Dawkins had never before been disciplined for a violent offense in prison. (Dkt. 110 ¶ 40.)

Following the attack, IDOC medical technicians transported Oakley to Presence St. Joseph Hospital where Dr. Clyde Dawson diagnosed Oakley with, among other things, a severe, close head injury with diffuse axonal injury and a facial laceration. (Dkt. 118 ¶ 14.) Oakley remained hospitalized through January 3, 2015 to receive treatment for his brain injury. (*Id.* ¶ 15.) Upon return to Stateville, he remained in inpatient treatment in the prison's infirmary until June 25, 2016. (*Id.* ¶ 16.) Because of his brain injury, Oakley has no memory of the attack against him or the days and weeks immediately following the attack. (Dkt. 94-1 at p. 5.)

Following the December 4, 2014 incident, IDOC employees removed Oakley's property box and legal box from his cell. (Dkt. 118 ¶ 46.) Oakley did not see his legal box again until sometime in 2015 when he was a patient in the Stateville infirmary. (*Id.*) Oakley testified that when IDOC returned the legal box to him, documents were missing, including copies of kites and responses to and from Rabideau and Miles and grievance documents related to his attempt to get a roommate change. (*Id.* ¶ 47.) IDOC has no records regarding where Oakley's legal box was kept between December 4, 2014 and January 19, 2015. (*Id.* ¶ 48.)

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *see also Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018). However, "'inferences that are supported only by speculation or conjecture will not defeat a summary judgment motion.'" *Herzog v. Graphic Packaging Intern., Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (quoting *Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)).

## DISCUSSION

Prison officials have a duty pursuant to the Eighth Amendment's prohibition against cruel and unusual punishment to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 831–33 (1994). Prison officials violate this duty when they are deliberately indifferent to an excessive risk to an inmate's safety. *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). There are two components to a deliberate indifference claim: 1) the prisoner must be exposed to objectively serious risk of harm, and 2) judged subjectively, the prison official must have actual, not merely constructive, knowledge that such a risk exists. *Gevas v. McLaughlin*, 789 F.3d 475, 480 (7th Cir. 2015). In other words, a prisoner must demonstrate that an official

knew of and disregarded an excessive risk to inmate health or safety. *Id*. Whether a prison official had the requisite knowledge can be demonstrated through inference from circumstantial evidence. *Id.* A prisoner normally proves that an official had such knowledge "'by showing that he complained to prison officials about a specific threat to his safety.'" *Id.* (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). But "[c]omplaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 789 F.3d at 480–81; *see also, e.g.*, *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) ("[The prisoner's] vague statement that inmates were 'pressuring' him and 'asking questions' were simply inadequate to alert the officers to the fact that there was a true threat at play."); *Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008) (prisoner's statements to guards that did not identify who was threatening him or what the threats were was insufficient to support an inference of actual knowledge); *Butera v. Cottey*, 285 F.3d 601, 606 (7th Cir. 2002) (prisoner's vague statement that he was "having problems" in his cellblock and "needed to be removed" were too vague). The Court addresses whether Oakley has satisfied this standard with respect to each of the six defendants.

I. **Placement Officer Karen Rabideau**

Construing the facts in the light most favorable to Oakley, as the Court must at this juncture, Oakley sent Rabideau a kite requesting a transfer because he was afraid of being violently assaulted by his cellmate. (Dkt. 118 ¶ 26.) Dawkins likewise sent Rabideau a kite requesting a transfer because he was not getting along well with his cellmate and worried that a physical altercation could ensue if they were not separated. (Dkt. 118 ¶ 27; Dkt. 110 ¶ 47.) While Rabideau insists that she did not receive either of these kites, she readily admits that she kept no record of the kites she received. (Dkt. 94-6 at p. 9; Dkt. 118 ¶ 28.) Oakley also testified that he received a response from

7

Oakley indicating that he was "properly placed." (Dkt. 118 ¶ 30.)[3] Dawkins does not recall receiving a response. (*Id.*)

Given that two inmates testified that they sent Rabideau kites indicating the potential for violence and Rabideau's admission that she kept no record of similar kites, a reasonable jury could conclude that she did indeed receive the kites and therefore had actual notice of a specific risk to Oakley's safety existed. The question then becomes, assuming that she received these kites, whether the kites suggested that Dawkins posed an objectively serious risk of harm to Oakley. A reasonable jury could also respond to that question in the affirmative. Considering the fact that Dawkins had a violent history as a convicted murderer and that both inmates put Rabideau on notice that they were concerned about the possibility of an altercation breaking out between them, a reasonable jury could conclude that Rabideau's failure to take action constituted deliberate indifference to an imminent, specific threat that Dawkins would seriously injure Oakley. Accordingly, the Court denies summary judgment as to the claim against Rabideau.

## II. Grievance Officer Anna McBee

Viewing the evidence in the light most favorable to Oakley, he sent a written grievance to Anna McBee in November of 2014, indicating that he feared for his safety because he was cellmates with Dawkins. (Dkt. 118 ¶ 35.) Oakley proceeded to suggest an alternate cellmate. (*Id.*) McBee responded to him, indicating the she was denying the grievance and refused to take action to separate Oakley and Dawkins. (*Id.*) Although McBee does not recall receiving such a grievance or responding to the grievance, a reasonable jury could conclude—on the basis of Oakley's testimony and the fact that Stateville had no process in place for logging grievances—that Oakley

---

[3] Whether Oakley actually sent such a kite and received a response is a question of fact for the jury to decide, taking into account whether the kite and response went missing when Stateville took possession of his legal box while he was in the hospital.

8

did indeed send her the grievance. A jury could also conclude that the grievance, which included a non-vague threat—namely, Oakley's fear that Dawkins would assault him—was sufficient to put McBee on actual notice that Oakley faced an objectively serious risk of harm. Because McBee took no action in the face of this risk, a reasonable jury could find McBee liable to Oakley for deliberate indifference. Accordingly, McBee is not entitled to summary judgment.

## III. Counselor Sherwin Miles

Again viewing the evidence in the light most favorable to Oakley, he sent a kite in October or November of 2014 to Sherwin Miles asking to be moved away from Dawkins because he feared for his safety. (Dkt. 118 ¶ 33.) Miles took no action in response to this kite, but instead responded that Oakley was "properly placed." (*Id.*) Oakley also copied Miles on the grievance he sent to McBee and received no response from Miles. (Dkt. 118 ¶ 35.) While Miles contends that she never received such a kite or grievance, she admits that she did not log or retain inmate kites and grievances. (Dkt. 118 ¶¶ 36, 38.) And while Oakley is unable to produce physical evidence of the response he received from Miles, a reasonable jury could still conclude—given Stateville's failure to document what it did with Oakley's legal box while he was in the hospital—that he received the "properly placed" response from Miles. On the basis of this evidence, a reasonable jury could conclude that Dawkins posed a serious risk to Oakley, that Oakley made Miles aware of the risk, and that Miles took no action to mitigate that risk. Therefore, Miles is not entitled to summary judgment.

## IV. Lieutenant Brian Givens

Once again viewing the evidence in the light most favorable to Oakley, the analysis as to Lieutenant Givens is largely the same. Namely, Oakley approached Givens in person to explain that he wanted to be moved from his cell due to his fear of living with Dawkins. (Dkt. 118 ¶ 44.)

Givens responded by saying "we'll see what happens." (*Id.*) But Givens took no follow-up action to protect Oakley, like placing Oakley in protective custody, which Givens was empowered to do as a lieutenant. (*Id.* ¶¶ 45, 49.) A reasonable jury could conclude on the basis of this evidence that Givens was actually aware of a serious risk to Oakley's safety and that he took no action to protect Oakley from that risk. So Givens is not entitled to summary judgment either.

## V.     Warden Tarry Williams

The only allegation in the record pertaining to Tarry Williams's knowledge of a potential threat to Oakley is that he sometimes reviewed inmate grievances. (Dkt. 118 ¶ 41.) But there is no indication in the record that Williams reviewed any grievance written by Oakley nor that any other prison employee made Williams aware of such a grievance. Rabideau confirmed, for example, that she did not forward kites she received to the warden. Therefore, there exists insufficient evidence in the record to establish that Williams himself had actual knowledge of a serious threat to Oakley's safety. Oakley attempts to rely on actions Williams took after the December 4, 2014 incident to suggest Williams's liability, but those actions are irrelevant to determining whether Williams was deliberately indifferent to a serious *ex ante* risk of violence against Oakley. Accordingly, Williams is entitled to summary judgment.

## VI.    Legal Mail Officer Yolanda Nelson

Oakley relies on a single fact to suggest that Nelson is liable to him for deliberate indifference; namely, that she called him a "racist," a "fag," and a "woman hater" in front of other inmates, including Dawkins. (Dkt. 118 ¶ 23.) There is no proper evidence before the Court, however, that Dawkins was homophobic or that Nelson was aware that by declaring before Dawkins that Oakley was homosexual or racist that she was increasing the likelihood that the Dawkins would seriously injure Oakley. Nobody ever made Nelson aware that Dawkins posed a

10

threat to Oakley, so she had no reason to anticipate that making such a comment would inflame Dawkins's passions and cause him to attack Oakley. Moreover, Dawkins does not even recall her making these statements about Oakley and stated that he attacked Oakley because Oakley was touching his property and annoying him while he slept (Dkt. 94-8 at p. 4), not because Oakley was racist or homosexual. On this record, no reasonable jury could conclude that Nelson was actually aware of a serious threat that Dawkins posed to Oakley nor that Nelson's actions were causal in Dawkins's decision to attack Oakley.[4] Nelson is therefore entitled to summary judgment.

## CONCLUSION

On the basis of the evidence before the Court, a reasonable jury could conclude that Dawkins posed an objectively serious risk of harm to Oakley and that Defendants Givens, McBee, Miles, and Rabideau were actually aware of that risk. No reasonable jury could reach that same conclusion with regard to Defendants Williams and Nelson. The Court therefore grants Defendants' Motion for Summary Judgment [92] as to Defendants Williams and Nelson, but denies the Motion as to Defendants Givens, McBee, Miles, and Rabideau.

_____
Virginia M. Kendall
United States District Judge

Date: April 14, 2020

---

[4] In Oakley's response brief, Oakley suggests that Nelson is liable for "wanton infliction of psychological pain." But there is no count for wanton infliction of psychological pain in the Oakley's Amended Complaint. (Dkt. 25.) The only count against Nelson and all the Defendants is a deliberate indifference count. Whether Nelson is liable for wanton infliction of psychological pain is therefore beyond the scope of the present litigation.